505 S.E.2d 344

CoSaundra Morrow DODGE, Plaintiff,

v.

Charles O. DODGE, Defendant.

George W. MORROW, Virginia B. Morrow, and C. Franklin Rizer, Respondents,

v.

Charles O. DODGE, Appellant.

No. 2831.

Court of Appeals of South Carolina.

Heard March 3, 1998.
Decided April 20, 1998.
Rehearing Denied Oct. 19, 1998.

402

Mark A. Mason, of Mason Law Firm, Mt. Pleasant, for appellant.

Doyet A. Early, III, of Early & Ness, Bamberg, for respondents.

James L. Verenes, Aiken, Guardian Ad Litem.

STILWELL, Judge:

This appeal involves a dispute between the father, the maternal grandparents and the stepfather regarding custody of two minor children after the death of their mother. The

family court granted joint legal custody. It awarded physical custody to the stepfather and grandparents and gave the father visitation. The father appeals the joint custody arrangement as well as several other issues. We affirm in part, reverse in part and remand.

## FACTS

Charles O. Dodge (the father) and CoSaundra Morrow Dodge Rizer (the mother) were married on December 1, 1984. Two children were born of the marriage: Charles Morrow Dodge, 11, born on May 2, 1986, and William Brett Dodge, 8, born on September 19, 1989. The mother and father separated on August 22, 1992 and were divorced by order of the family court dated September 21, 1993. The family court order adopted an agreement between the mother and the father giving the mother custody and the father reasonable visitation. The order further provided for the payment of child support by the father.

The mother married C. Franklin Rizer (the stepfather) on May 19, 1994. On February 19, 1996, the mother gave birth to her third son, Kirkland Lee Rizer. The mother died on February 22, 1996 from complications arising from her pregnancy and delivery. Kirkland survived.

## PROCEDURAL HISTORY

On February 28, 1996, the father filed a motion seeking an order confirming that custody of his children automatically reverted to him following the mother's death. On March 1, 1996, the stepfather and the maternal grandparents, George and Virginia Morrow, joined as plaintiffs in an action against the father seeking custody. The father answered and counterclaimed, also seeking custody.

The family court held a temporary hearing on March 4, 1996. By temporary order dated March 15, 1996, the family court granted the parties joint custody of the children. The court also appointed a guardian ad litem for the children. Pursuant to the terms of this order, the children were to remain with the stepfather and grandparents in Bamberg, South Carolina, until ten days after the completion of the school year. Then the children were to be with the father at

his home on Sullivan's Island for six weeks. During the period the children remained with the stepfather and grandparents, the father was to continue paying child support and his visitation rights remained in full force and effect. During the six week period the children were to be with the father, the stepfather and grandparents were to have visitation on every other weekend and the father's child support obligation was to be suspended. The order further provided that "in the event this case has not been heard on its merits and a final disposition made, the Court will conduct another temporary hearing at the end of the father's six week custodial period."

On March 19, 1996, the father filed a petition for a writ of supersedeas in the South Carolina Supreme Court arguing the family court erred in failing to grant him custody absent a finding that he was unfit, and in ordering a joint custodial arrangement without the consent of the parties. This petition was denied on May 14, 1996.

Pursuant to the March 15, 1996 order, the family court held a second temporary hearing on July 16, 1996. The resulting temporary order, dated July 17, 1996, provided that the children were to be returned to the custody of the stepfather pending a final hearing on the merits. The order further provided that in the event the final hearing on the merits was not concluded by August 16, 1996, the court would again revisit the issue of where the children would live pending a final hearing on the merits. The father's subsequent motion to reconsider was denied.

Following the denial of his motion for reconsideration, the father again petitioned the South Carolina Supreme Court for a writ of supersedeas. A supreme court justice granted the petition on July 18, 1996, prior to receiving a return to the petition. However, upon review, the supreme court vacated the writ on July 25, 1996.

The family court held a final hearing on the merits on August 12, 13, 15, and 16, 1996. By order dated August 21, 1996, the court ordered the father to undergo a psychological evaluation. The order provided the record would remain open pending the completion of the evaluation. The order further provided that pending the court's receipt of the psychologist's evaluation, custody of the children would remain with the

stepfather and grandparents and the father's visitation rights would continue as previously ordered.

On January 13, 1997, the final hearing was reconvened, at which time the court heard testimony from Dr. James Maish, the court appointed psychologist.

On April 8, 1997, the family court issued its final order granting the father, stepfather and grandparents joint legal custody. Pursuant to the terms of the order, the stepfather and grandparents were to have physical custody of the children during the school year, with visitation for the father on every other weekend, excluding Mother's Day, and alternating Spring Break and Thanksgiving holidays. The court also granted the father visitation during Christmas vacations. The father was to have physical custody of the children during the summer, including every Father's Day, with two weekend visitations for the stepfather and grandparents.

The court ordered the father to continue meeting his child support obligation, including an arrearage, as previously ordered. The court further ordered that social security benefits which the children receive due to the mother's death were to be paid to the stepfather, who was in turn to pay the benefits to the father during his custodial period. The stepfather was awarded the yearly tax exemption for the children. The family court further found that each party should be responsible for his own attorney fees, and that the father should pay one-half of the guardian ad litem fees with the stepfather and grandparents jointly responsible for payment of the remaining half. The court denied the father's subsequent motion for reconsideration.

## STANDARD OF REVIEW

In a custody dispute, the paramount and controlling factor is the welfare and best interests of the child. *Fisher v. Miller,* 288 S.C. 576, 578, 344 S.E.2d 149, 150 (1986). This court may find facts in accordance with its own view of the preponderance of the evidence. *Epperly v. Epperly,* 312 S.C. 411, 440 S.E.2d 884 (1994). We are not required, however, to ignore the fact that the trial judge, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Cherry v.*

*Thomasson,* 276 S.C. 524, 280 S.E.2d 541 (1981). Because the appellate court lacks the opportunity for direct observation of the witnesses, it should accord great deference to trial court findings where matters of credibility are involved. *See Aiken County Dep't of Social Servs. v. Wilcox,* 304 S.C. 90, 403 S.E.2d 142 (Ct.App.1991). This is especially true in cases involving the welfare and best interests of children. *Id.*

## I. STANDING

The father argues the stepfather lacked standing to initiate this action for custody. Specifically, the father argues that neither a stepfather nor any other third party may initiate a custody proceeding against a child's parent unless the action is brought as a dependency proceeding. Accordingly, claims the father, "a stepparent has no standing to claim custody rights or visitation rights relative to stepchildren." The father cites no authority for this proposition.

The father further asserts that in order to assume the role of a parent, a stepparent must terminate the rights of a living parent and legally adopt. We are aware that third parties, including stepparents, have standing to bring actions for the termination of parental rights in conjunction with an adoption proceeding. *Donahue v. Lawrence,* 280 S.C. 382, 312 S.E.2d 594 (Ct.App.1984) (stepmother had standing to initiate termination of parental rights action); *see Greenville County Dep't of Social Servs. v. Bowes,* 313 S.C. 188, 437 S.E.2d 107 (1993) (action to terminate parental rights may be brought by any interested party, including foster parents).

Furthermore, the supreme court has permitted a third party to maintain a custody action against a natural parent. *Hogan v. Platts,* 312 S.C. 1, 430 S.E.2d 510 (1993). In *Hogan,* the child's maternal aunt and uncle sued the father for custody after the father consented to the aunt and uncle keeping his infant daughter immediately after the mother's death. The supreme court, however, did not expressly address standing.

In light of our disposition of this case, we decline to determine the broader issue of whether a stepparent has standing to bring a custody action against a natural parent. Here the stepfather sought joint custody with the children's maternal grandparents. Grandparents have sued for custody. *See*

*Cook v. Cobb,* 271 S.C. 136, 245 S.E.2d 612 (1978). Moreover, the children were living with their stepfather immediately after the mother's death and the mother appointed the stepfather as the children's legal guardian in her will.

## II. CUSTODY

■ On appeal, the father argues the family court erred in awarding joint legal custody and in failing to award him sole custody of his children. We agree.

■ Generally, there exists a rebuttable presumption that the right to custody of a minor child automatically reverts to the surviving parent when the custodial parent dies. *Oehler v. Clinton,* 282 S.C. 25, 317 S.E.2d 445 (1984). In *Kay v. Rowland,* 285 S.C. 516, 331 S.E.2d 781 (1985), our supreme court recognized that natural parents have superior rights in child custody disputes with third parties. However, the court has also recognized that in all custody controversies, including those between natural parents and third parties, the best interest of the child remains the primary and controlling consideration. *Hogan,* 312 S.C. at 3, 430 S.E.2d at 511. Indeed, the superior rights of the natural parent must yield where the interest and welfare of the child clearly require alternative custodial supervision. *Oehler,* 282 S.C. at 28, 317 S.E.2d at 447 (citing *Comer v. Comer,* 61 N.C.App. 324, 300 S.E.2d 457 (1983)).

In *Moore v. Moore,* 300 S.C. 75, 386 S.E.2d 456 (1989), a father who had relinquished his son to a third party during difficult times brought an action seeking to regain custody of his son. The court held:

> The best interest of the child is the primary and controlling consideration of the Court in all child custody controversies. Nevertheless, there is a rebuttable presumption that it is in the best interest of any child to be in the custody of its biological parent. In *Rowland,* this Court placed a substantial burden on any third party attempting to take custody over a biological parent and "... recognized the superior rights of a natural parent in a custody dispute with a third party. Once the natural parent is deemed fit, the issue of custody is decided."

*Moore,* 300 S.C. at 78–79, 386 S.E.2d at 458 (citations omitted) (quoting *Rowland,* 285 S.C. at 517, 331 S.E.2d at 781–82).

■ In *Moore,* the supreme court outlined the criteria to consider in determining custody when a natural parent seeks to reclaim custody from a third party. The four factors to consider are:

1) The parent must prove that he is a fit parent, able to properly care for the child and provide a good home.

2) The amount of contact, in the form of visits, financial support or both, which the parent had with the child while [the child] was in the care of a third party.

3) The circumstances under which temporary relinquishment occurred.

4) The degree of attachment between the child and the temporary custodian.

*Id.* at 79–80, 386 S.E.2d at 458 (citations omitted). The rebuttable presumption standard requires a case by case analysis. *Id.*

1. *Fitness*

■ The father has satisfied the first factor because the family court determined the father was a fit parent and the grandparents and stepfather do not dispute this finding on appeal. Therefore, it is the law of the case. *See Stone v. Salley,* 244 S.C. 531, 137 S.E.2d 788 (1964) (the unappealed portion of a trial court's judgment presents no issue for determination by the reviewing court and constitutes to such extent the law of the case).

Currently, the father rents a three bedroom home on Sullivan's Island where he lives alone. The father testified the home is furnished and clean, and each child has his own room. The guardian ad litem testified the home is a suitable place for the children to live. In addition, the father has made arrangements for the children to attend Sullivan's Island Elementary School, which is located only two blocks from the home. The school offers an award-winning after-school program.

At the time of trial, the father had been employed for three years at Dunes Properties as a property manager. According

to the president of Dunes Properties, the father is an excellent employee and his employment with the company is secure.

While the father was deemed to be fit, the family court was concerned about a past criminal incident. Using information gleaned from his employment at a targeted bank, the father conspired with two other individuals to rob a sixty-seven year old female courier who was carrying $240,000 in bank funds. The scheme to rob the courier involved the use of guns, and one of the father's co-conspirators had talked of having previously killed someone. The father took his oldest son with him when he met with the co-conspirators to plan the robbery. The father testified, however, that the conversation planning the robbery took place outside his son's hearing. The robbery did not take place because one of the father's co-conspirators was a government informant.

In August 1992, the father pled guilty to conspiracy to commit bank robbery and served seventeen months in federal prison. At the time of the father's incarceration, the children were 8 and 4 years old. The children were told the father was away at school and were not told about their father's criminal action. At the time of trial, the father was serving a probationary sentence. His probation ended December 7, 1997.

The court ordered psychologist determined that the father had overcome the problems regarding his criminal involvement, was working to be a good citizen and suffered from no psychological problems which would prevent his ability to parent. The psychologist testified he did not see any reason that the father could not serve as the custodial parent of his sons.

The father's probation officer was deposed. The probation officer testified the father was "one of the most compliant, cooperative and stable individuals I supervise." The probation officer also testified that the father showed remorse for his past criminal action and was focused on maintaining a stable environment.

Several other witnesses testified on the father's behalf. The testimony of these witnesses, including that of the father's family, friends, and co-workers, establish that the father has, since the time of his arrest, made great strides in rehabilitating himself both financially and psychologically. Further, the

testimony of these witnesses is evidence of the father's love for his children and current fitness as a parent.

## 2. *Visitation and Financial Support*

As to the second factor in *Moore,* the father has regularly exercised visitation with the children. In fact, he failed to exercise his visitation privileges only while he was in prison. Even while in prison though, the father wrote and telephoned his sons and made arrangements for them to receive their birthday presents. The father has also, with the exception of an arrearage accrued while he was imprisoned, regularly made child support payments.

## 3. *Circumstances Surrounding Relinquishment*

Under the circumstances in this case, the third factor is different than that contemplated in *Moore.* The circumstances under which the father no longer had custody are different because he did not "relinquish" custody to a third party. At the time of the divorce, the mother and father agreed that the mother would have custody and the father would have reasonable visitation. When the mother died, the father was prevented from obtaining physical custody of his sons and so he filed the motion in family court seeking an order confirming his custodial rights.

## 4. *Degree of Attachment*

The fourth factor requires an analysis of the degree of attachment between the children and their custodians, the stepfather and the grandparents. While there is evidence that the children have a close and loving relationship with their stepfather and grandparents, there is also evidence that a "psychological parent-child" relationship does not exist between the children and their stepfather or grandparents. *See Moore,* 300 S.C. at 80–81, 386 S.E.2d at 459 (considering whether psychological parent-child relationship exists in order to determine the degree of attachment). *Compare Malpass v. Hodson,* 309 S.C. 397, 400, 424 S.E.2d 470, 472 (1992) (finding child had bonded with his mother despite living with his grandparents) *with Kramer v. Kramer,* 323 S.C. 212, 220, 473

S.E.2d 846, 850 (Ct.App.1996) (finding the temporary custodians were the only parents the child had ever known).

The children have lived in Bamberg since their birth. They are honor roll students and have attended Bamberg's public school system exclusively. They are also involved in extracurricular school and community activities, including honors programs, music programs, sports, scouting, and religious training.

The grandparents have assisted in the care of the children since before the mother's death. Prior to the mother's death, the grandparents babysat the children when necessary and had bi-weekly "play days" on a regular basis. The grandparents also regularly picked the children up from school and assisted them with homework assignments. Following the mother's death, the grandparents increased their involvement with the children. The grandparents also helped the stepfather care for the children's brother Kirkland, particularly at night. The children, however, spend the majority of their nights in the stepfather's home.

The stepfather is forty-nine years old and is employed as an agency manager at Orangeburg County Farm Bureau. Also, the stepfather owns a four-bedroom home in Bamberg where the children have resided since shortly after the mother and stepfather married. The grandparents live in a home only a short distance away from the stepfather's home. The children have lived with the stepfather since he married their mother in May 1994.

The stepfather and grandparents testified the children are happy in their Bamberg home and have developed a close bond with their infant brother. The grandparents also testified regarding the bond between the children and the stepfather.

The guardian ad litem testified that in his opinion the children's best interests required an order granting custody to the stepfather and grandparents, with visitation for the father. In making this recommendation, the guardian considered the children's bond with the father, stepfather, grandparents and their half-brother Kirkland. Further, the guardian placed great emphasis on the fact that the children have always resided in Bamberg and have an established support system in

the community. At oral argument, however, the guardian conceded that he may have recommended giving custody to the father if the father lived in Bamberg.

When faced with the decision whether to give custody to the biological parent or to a third party, the court of appeals has stated:

> The question, then, is not simply who has the most suitable or stable home environment at the time of the hearing. Rather, we must ask if the circumstances in this case, analyzed with the criteria set forth in *Moore*, overcome the presumption that a return of custody to the biological parent is in the best interest of the child.

*Sanders v. Emery*, 317 S.C. 230, 234, 452 S.E.2d 636, 638–39 (Ct.App.1994).

Although the family court determined the father was fit, it ruled that the grandparents and stepfather rebutted the presumption that "a finding of fitness automatically vests custody in the natural parent." We recognize that the trial judge was faced with a difficult decision in this case. Upon review, however, we are convinced that improper weight was accorded to the children's ties to the Bamberg community and insufficient weight was given to the strong presumption favoring the return of custody to the father. Therefore, we grant the father sole custody of his children.

## III. VISITATION

The father contends the family court "erred by granting the stepfather of 19 months any autonomous right of custody or visitation" but agrees the grandparents are entitled to reasonable autonomous visitation rights with his sons.

Under certain circumstances, grandparents are entitled to visitation. The applicable statute states:

> To order periods of visitation for the grandparents of a minor child where either or both parents of the minor child is or are deceased, or are divorced, or are living separate and apart in different habitats regardless of the existence of a court order or agreement, and upon a written finding that the visitation rights would be in the best interests of the child and would not interfere with the parent/child relation-

ship. In determining whether to order visitation for the grandparents, the court shall consider the nature of the relationship between the child and his grandparents prior to the filing of the petition or complaint.

S.C.Code Ann. § 20–7–420(33) (Supp.1997). Therefore, the statute specifically permits the court to award grandparents visitation. *See Chavis v. Witt,* 285 S.C. 77, 79, 328 S.E.2d 74, 75 (1985) ("[W]hen a parent dies, the relationship of the grandparents to the child of the deceased person is not obliterated.") Grandparents have been denied visitation, however, when their child is alive and their child has been awarded visitation with his child (the grandchild). *See Brown v. Earnhardt,* 302 S.C. 374, 377, 396 S.E.2d 358, 360 (1990) (holding that *Chavis* does not require that all grandparents get visitation because the grandchild saw her paternal grandparents during her visits with her father and "[v]isitation by grandparents should be derivative").

 While the father agrees the grandparents should be awarded visitation, he urges us to "provide specific guidance to the family court judge so that an award of visitation to grandparents is not excessive and does not amount to joint custody." We agree with the father that this is not the same situation as when the court awards reasonable visitation to a noncustodial parent. The father proposes that the children visit their grandparents one weekend each month. It is obvious the children have a strong and loving bond with their grandparents. We believe under the circumstances that one weekend of each month and two weeks during each summer would be a reasonable amount of visitation with the grandparents. The parties may, of course, voluntarily expand the visitation if they mutually agree to do so.

 We have not found a case in South Carolina, however, where a stepfather has been awarded autonomous visitation privileges with his stepchild. A grandparent's right to visitation stems from the natural parent's right for such visitation. The supreme court has stated:

It would seldom, if ever, be in the best interests of the child to grant visitation rights to the grandparents when their child, the parent, has such rights.

Visitation by grandparents should be derivative; otherwise the child might have four, or even six people competing for his company: father, mother, paternal grandparents and maternal grandparents.

*Id.*

The court in *Brown* also stated: "The bond of love and affection existing between grandparents and a child does not, in and of itself, justify carving out of the custody and visitation rights of the natural parents another visitation right and vesting it in the grandparents." *Id.*

We know of no basis on which to award the stepfather visitation. While the grandparents' right to visitation is derived from their daughter's right, the stepfather has no such derivative right. The evidence at trial is that the stepfather and the grandparents live near each other and maintain close contact. When the children visit their grandparents they will be able to visit their stepfather and their half-brother, Kirkland.

## IV. OTHER ISSUES

### A. Child Support

Because we award custody of the children to the father, he is no longer required to pay child support. Regarding the back child support, it was within the trial court's discretion to order the father to pay his child support payments to the stepfather while the stepfather had physical custody of the children. *See* S.C.Code Ann. § 20–7–420(16) (1976).

The family court ordered the father to continue to pay his child support arrearage to the stepfather. The stepfather was ordered to put the funds in the children's trust. Because the father now has sole responsibility for his children and will not receive financial assistance or child support from another party, we hold that the father is no longer required to pay the arrearage.

### B. Tax Exemptions

Because the father is awarded custody, he is entitled to the future tax exemptions permitted by law. The family

court did not abuse its discretion, however, in allocating the tax exemptions to the stepfather for periods where the children were within his custody. *Josey v. Josey*, 291 S.C. 26, 351 S.E.2d 891 (Ct.App.1986) (holding that under the federal tax law, the custodian of the child is entitled to claim the child as a dependent).

## C. Guardian Ad Litem's Fee

The father asserts the family court erred in ordering him to pay one-half of the guardian ad litem's fee rather than one-third. We disagree. For all practical purposes, the stepfather and grandparents constituted a single party with a single objective in this action. The family court acted within its discretion in taxing one-half of the fee to the father. *See* S.C.Code Ann. § 20–7–420(37); *see also Dunn v. Dunn*, 298 S.C. 365, 380 S.E.2d 836 (1989) (liability for costs is in the court's discretion). The father's argument regarding the amount of the guardian ad litem's fee is not preserved for appeal inasmuch as the father failed to specifically raise the issue in his Rule 59(e), SCRCP, motion for reconsideration.

## D. Attorney Fees

The father also assigns error to the family court's failure to award him attorney fees. The award of attorney fees is within the discretion of the court. *Hardwick v. Hardwick*, 303 S.C. 256, 399 S.E.2d 791 (Ct.App.1990). This has been a lengthy legal dispute. Even though the stepfather and grandparents were successful at the trial of the case, the family court determined that each party would be responsible for his own attorney fees. We affirm this portion of the court's order.

## E. Interview

The father further contends that the court erred in failing to interview the oldest child. In all matters involving children, the decision whether to interview the children in private conference is a matter within the family court's discretion. Rule 22, SCFCR. While we think interviewing the 11 year old may have been helpful, we find no abuse of discretion

in the family court's decision not to interview the child. Our supreme court has stated the following on the issue:

> Our Court has given little significance to the wishes of a six year old child. On the other hand, our Court has given great weight to the wishes of a child sixteen years of age. It is clear that the wishes of a child of any age may be considered under all the circumstances, but the weight given to those wishes must be dominated by what is best for the welfare of the children.

*Moorhead v. Scott*, 259 S.C. 580, 193 S.E.2d 510 (1972) (citations omitted).

### F. Social Security Payments

The father's argument alleging error on the part of the family court in failing to require the stepfather to remit to him social security payments disbursed during the summer of 1996 is not preserved for appeal. This issue was neither ruled on by the family court nor raised in the father's Rule 59(e), SCRCP motion for reconsideration.

### G. Compliance with Rule 26, SCFCR

The father contends the family court erred by failing to make the specific findings of fact which supported its decision as required by Rule 26(a), SCFCR. Rule 26(a) provides: "An order or judgment pursuant to an adjudication in a domestic relations case shall set forth the specific findings of fact and conclusions of law to support the court's decision." We find the family court order contained specific findings of fact and conclusions of law to support its decision. That we choose to disagree with the family court's ultimate conclusion of custody does not mean the family court order failed to comply with Rule 26(a).

The father also contends the family court failed to issue its final order in a timely manner pursuant to Rule 26(c), SCFCR. The final hearing took place over four days in August 1996. Then the hearing was reconvened on January 13, 1997 for the court to receive evidence regarding the results of the father's court-ordered psychological evaluation. The family court issued its final order April 8, 1997.

Rule 26(c) provides: "Except under exceptional circumstances, an order in a domestic relations case shall be issued as soon as possible after the hearing, but not later than 30 days thereafter." Rule 26(c), SCFCR. It was nearly 3 months after the conclusion of the hearing before the family court issued its order. We realize this was a difficult case. The only relief the father requests is that should this case be remanded, this court should instruct the family court to be mindful of Rule 26. Therefore we do so now.

## H. Guardian ad Litem's Recommendation

We find no merit in the father's claim that the family court erred in considering the guardian ad litem's recommendation as to custody. Specifically, the father argues the guardian's testimony was "so legally and logically flawed that it should have been wholly disregarded by the court." The role of the guardian ad litem in making custody recommendations is to aid, not direct, the court. Ultimately, the custody decision lies with the trial judge. *See Shainwald v. Shainwald,* 302 S.C. 453, 395 S.E.2d 441 (Ct.App.1990) (the guardian ad litem does not usurp the judge's function). Here, the family court explicitly considered, but did not rely solely on, the guardian's recommendation. Under the facts of this case, we find no abuse of discretion in the weight the court gave to the guardian's recommendation.

## I. Lack of Jurisdiction

The father contends that because the stepfather and grandparents failed to serve or file their complaint prior to the first temporary hearing, the family court lacked jurisdiction to grant their request for temporary custody. Specifically, the father alleges his motion to confirm custody was the only motion before the court at the time of the first temporary hearing. We find that this issue is moot. "A case becomes moot when judgment, if rendered, will have no practical legal effect upon existing controversy. This is true when some event occurs making it impossible for [a] reviewing [c]ourt to grant effectual relief." *Jones v. Dillon–Marion Human Resources Dev. Comm'n,* 277 S.C. 533, 536, 291 S.E.2d 195, 196 (1982). State appellate courts will not issue advisory opinions on questions for which no meaningful relief can be granted.

*Gainey v. Gainey,* 279 S.C. 68, 301 S.E.2d 763, 764 (1983). Here, the time the children spent with the stepfather pursuant to the provisions of the first temporary order has passed and a final order has been issued. No effectual relief can be provided by this court.

Accordingly, the order of the trial court is reversed as to the joint custody award and as to the father's child support arrearage. We remand for the family court to determine the details and procedures attendant to the grandparents' visitation schedule consistent with the mandates of this opinion. We affirm all remaining issues.

For the foregoing reasons, the decision of the family court is

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

GOOLSBY and HEARN, JJ., concur.